IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ALLSTATE INSURANCE COMPANY
*Plaintiff*,

v.                                                                    Civil Action No. ELH-17-3293

JAM #32 CORP., *et al.*
*Defendants*.

## MEMORANDUM OPINION

In this insurance dispute, plaintiff Allstate Insurance Company ("Allstate") has filed a declaratory judgment action against defendants Jam #32 Corp. ("Jam #32"); Dear Management & Construction Company ("Dear Management"); and Stanley Rochkind, individually and as trustee of the assets of both Dear Management and Jam #32. *See* ECF 1; *see also* ECF 4 ("Amended Complaint").[1] Allstate has also sued Da'Quan Terrel Roberts and Sha'Quan Roberts (collectively, the "Tort Plaintiffs"), who were the plaintiffs in a lead paint action that they filed against Rochkind in February 2016 in the Circuit Court for Baltimore City. *See Roberts v. Wyman Park Co.*, Case No. 24-C-16-949 (the "Tort Case"). In the Tort Case, the Tort Plaintiffs alleged injury from lead paint exposure in connection with a property owned, maintained, and/or managed by Rochkind. *See* ECF 1-2 (the "Tort Complaint").[2]

Beginning in June 1988, Allstate issued a Personal Umbrella Policy (ECF 1-3, the "Policy") to Rochkind, who owns and manages residential properties in Baltimore. ECF 1, ¶ 12. The Policy, which provided excess personal liability coverage to Rochkind, was continually

_____

[1] Dear Management and Jam #32 are forfeited Maryland corporations. ECF 1, ¶¶ 5,7.

[2] Jurisdiction in this case is founded on diversity, pursuant to 28 U.S.C. § 1332. ECF 1, ¶ 8.

renewed over the next decade. *Id.* But, on June 13, 1999, Allstate modified the terms to exclude coverage for claims arising from lead paint exposure. *Id.* Then, on or about June 13, 2000, Allstate cancelled the Policy. ECF 1-3 at 8. Allstate now seeks a declaration that it has no duty to defend or indemnify Rochkind for injuries allegedly sustained by the Tort Plaintiffs arising from lead paint exposure on or after June 13, 1999, *i.e.*, the effective date of the lead exclusion. *Id.* ¶ 11.

According to Allstate, Mr. Roberts' total lead exposure was 2678 days, and it insured Rochkind for 1381 days. Therefore, Allstate claims that its total liability is 51.57% of any damages awarded against Rochkind (1381/2678). ECF 31-1 at 10. According to Allstate, Rochkind is liable for the remaining 48.43% of any judgment in favor of Mr. Roberts. *Id.*

In Allstate's view, Ms. Roberts' total lead exposure was 1913 days, and it insured Rochkind for 616 days. Therefore, Allstate contends that its total liability is 32.20% of any damages awarded against Rochkind (615/1913). ECF 31 at 11. According to Allstate, Rochkind is liable for the remaining 67.8% of any judgment in favor of Ms. Roberts. *Id.*

Three motions are now pending. First, Allstate has moved for summary judgment (ECF 31), supported by a memorandum of law (ECF 31-1) (collectively, the "Summary Judgment Motion") and two exhibits. ECF 31-3; ECF 31-4. Defendants filed an opposition (ECF 36), supported by four exhibits. ECF 36-1 to ECF 36-4. Allstate replied on January 8, 2018. ECF 37.

The exhibits docketed at ECF 31-3 and ECF 31-4, which are Mr. Roberts' and Ms. Roberts' respective answers to interrogatories, contain personally identifiable information. Therefore, on May 2, 2019, the Court, sua sponte, directed the Clerk to seal these exhibits. *See* ECF 45. Plaintiff is directed to file a redacted copy of each exhibit, due by May 21, 2019.

On January 19, 2018, Allstate also filed a supplement, stating that the day before, Magistrate Judge A. David Copperthite "granted summary judgment in Allstate's favor in an

identical case." ECF 39 (citing *Allstate Ins. Co. v. Blue*, ADC-18-1199, 2019 WL 266281, at *4 (D. Md. Jan. 18, 2019)).  In response, defendants moved to strike Allstate's supplement.  ECF 41 (the "Motion to Strike").  Allstate opposes the Motion to Strike. ECF 42.

Defendants have also moved to stay the suit until the Maryland Court of Special Appeals decides *Robinson v. CX Re*, No. 01888, Sept. Term 2016, involving the proper method of allocating damages resulting from lead paint exposure.  ECF 43 (the "Motion to Stay").  Allstate opposes the Motion to Stay. ECF 44.

The Motions are fully briefed and no hearing is necessary to resolve them. *See* Local Rule 105.6.  For the foregoing reasons, I shall deny the motions.

## I.    Factual Summary

On February 17, 2016, in the Circuit Court for Baltimore City, Mr. Roberts sued Wyman Park Co. ("Wyman Park"); Homewood Realty, Inc. ("Homewood"); Stanley Sugarman, individually and on behalf of Wyman and Homewood; JAM #32; Dear Management; and Rochkind, individually and on behalf of JAM #32 and Dear Management. *Roberts v. Wyman Park Co.*, Case No. 24-C-16-949; *see* ECF 4, ¶ 9. On December 16, 2016, the complaint was amended to add Ms. Roberts as a plaintiff.  ECF 1-2; *see* ECF 4, ¶ 9.  Mr. Roberts, who is now 24-years of age, and Ms. Roberts, now 21-years of age, alleged unfair and deceptive trade practices, battery, and negligence.  ECF 1-2.

Allstate was not a party to the Tort Case, and the parties do not state whether Allstate provided a defense to Rochkind in the suit. *See* ECF 1-2.  During the pendency of the Tort Case, the parties engaged in discovery.  During discovery, Mr. Roberts stated that he resided at 919 N. Collington Avenue, Baltimore, Maryland from the time of his birth on April 2, 1995, until an unspecified date in September 1995.  ECF 31-3 at 2.  Mr. Roberts resided there with his aunt, Sally

Baldwin, and his mother, Melvina Dukes. *Id.* at 1-2. According to the Tort Plaintiffs, the property

contained lead paint. ECF 1-2, ¶ 10. The property was allegedly owned or operated by defendants

Wyman Park, Homewood, and Sugarman. *Id.* ¶ 3.[3]

Mr. Roberts resided at 1635 N. Spring Street, Baltimore, Maryland from September 1995

through 2002. ECF 31-3 at 1. Ms. Roberts resided there from the time of her birth on October 5,

1997 through 2002. ECF 31-4 at 1. Ms. Baldwin, Ms. Dukes, the Tort Plaintiffs' father, Chester

Roberts, and their sister, Ja'Quana Roberts, also lived at the Spring Street residence. ECF 31-3

at 1-2; ECF 31-4 at 1-2, 8.

According to the Tort Plaintiffs, the property at 1635 N. Spring Street, "contain[ed] lead

based paint in a dangerous condition." ECF 31-3 at 4; ECF 31-4 at 4. Consequently, they were

"exposed to and ingested lead-based paint, chips, flakes and dust." ECF 31-3 at 8; ECF 31-4 at 9.

And, the property was allegedly owned or operated by defendants JAM, Dear Management, and

Rochkind. ECF 1-2 ¶ 5.

The Tort Plaintiffs assert that they had elevated blood lead levels while residing at the

property. Mr. Roberts alleged that, "[b]ased on the medical records obtained, the first elevated

blood level is reported from a blood sample drawn 9/7/1996, indicating a blood lead level of 8

µ/Pb/dL." ECF 31-3 at 5. He also asserted that while living at N. Spring Street, his blood lead

levels ranged from between 8 and 9 µ/Pb/dL. *Id.* at 8. Ms. Roberts "was diagnosed with elevated

blood lead levels" throughout the period. ECF 31-4 at 9. She provided her blood lead levels with

respect to six dates: 6 µ/Pb/dL on April 9, 1998; 7 µ/Pb/dL on October 25, 2000; 5 µ/Pb/dL on

---

[3] It is unclear whether the Tort Plaintiffs continue to maintain that they are entitled to damages for Mr. Roberts' lead exposure at this property.

September 10, 2001; 4 μ/Pb/dL on August 21, 2002; 3 μ/Pb/dL on November 5, 2003; and 0 μ/Pb/dL on March 15, 2005. *Id.* at 5.

Additionally, according to the Tort Plaintiffs, they "suffered brain damage as a result of lead toxicity," but have "not yet been completely evaluated to determine the extent of [their] injuries." ECF 31-3 at 8; ECF 31-4 at 9.

## II.     The Policy

As noted, Allstate's request for declaratory judgment arises out of a Personal Umbrella Policy issued to Rochkind. *See* ECF 1-3. The Policy covered Rochkind's properties from June 13, 1988 until June 13, 2000. ECF 1-3 at 8; *see also* ECF 31-1 at 2. However, effective June 13, 1999, Allstate added a lead exclusion to the Policy. *Id.* at 17-19.

The Policy (ECF 1-3) "applies to an **occurrence** anywhere in the world while the insurance is in force." *Id.* at 10. An "occurrence" is "an accident or continuous exposure to conditions." *Id.* Further, it provides: "**Allstate** will pay when an **insured** becomes legally obligated to pay for **personal injury** or **property damage** caused by an **occurrence**." *Id.* at 12. The Policy defines "personal injury," in relevant part, to include "bodily injury, sickness, disease or death of any person." *Id.* at 11.

## III.     Choice of Law

Allstate asserts that Maryland law governs the legal issues in this diversity case. ECF 31-1 at 7-8. Defendants do not contest the point; they assume, without discussion, that Maryland law applies here. *See* ECF 36.

In an action based upon diversity of citizenship, a federal court must apply the substantive law of the state in which it sits, including that state's choice of law rules. *Klaxon Co. v. Stentor Elect. Mfg. Co.*, 313 U.S. 487, 496-97 (1941); *see Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507

F.3d 270, 275 (4th Cir. 2007); *Ground Zero Museum Workshop v. Wilson*, 813 F. Supp. 2d 678, 696 (D. Md. 2011); *Baker v. Antwerpen Motorcars, Ltd.*, 807 F. Supp. 2d 386, 389 n.13 (D. Md. 2011).

In a contract claim, Maryland courts follow the rule of *lex loci contractus*, applying the substantive law of the state where the contract was formed, unless there is a choice-of-law provision in the contract. *Erie Ins. Exch. v. Heffernan*, 399 Md. 598, 618, 925 A.2d 636, 648 (2007); *Am. Motorists Ins. Co. v. ARTRA Group, Inc.*, 338 Md. 560, 573, 659 A.2d 1295, 1301 (1995); *see also Cunningham v. Feinberg*, 441 Md. 310, 326, 107 A.3d 1194, 1204 (2015); *Lewis v. Waletzky*, 422 Md. 647, 657 n.8, 31 A.3d 123, 129 n.8 (2011). "For choice-of-law purposes, a contract is made where the last act necessary to make the contract binding occurs." *Konover Property Trust, Inc. v. WHE Assocs., Inc.*, 142 Md. App. 476, 490, 790 A.2d 720, 728 (2002) (citing *Commercial Union Ins. Co. v. Porter Hayden Co.*, 116 Md. App. 605, 672, 698 A.2d 1167, 1200 (1997), *cert. denied*, 348 Md. 205, 703 A.2d 147 (1997)).

The Policy does not appear to contain a choice of law clause. *See* ECF 1-3. Nor is it clear that the Policy was executed in Maryland, although the Property and the insureds are located in Maryland. But, "[t]ypically, '[t]he *locus contractus* of an insurance policy is the state in which the policy is delivered and the premiums are paid.'" *Porter Hayden*, 116 Md. App. at 673, 698 A.2d at 1200 (citation and some internal quotation marks omitted). This is because delivery of the policy and the payment of the premium are ordinarily the last acts necessary to make an insurance policy binding. *See Aetna Cas. & Sur. Co. v. Souras,* 78 Md. App. 71, 77, 552 A.2d 908, 911 (1989).

In any event, because the parties implicitly agree that Maryland law governs their claims, [the Court] need not inquire further into the choice-of-law questions." *Vanderhoof-Forschner v.*

*McSweegan*, 215 F.3d 1323 (Table) at *2 n.2 (4th Cir. 2000) (citing *American Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997) ("[W]here the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry.")). Accordingly, I shall apply the substantive law of Maryland.

## IV.     Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Formica v. Aylor*, 739 F. App'x 745, 754 (4th Cir. 2018); *Iraq Middle Mkt. Dev. Found. v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017). The nonmoving party must demonstrate that there is a dispute of material fact so as to preclude the award of summary judgment as a matter of law. *Ricci v. DeStefano*, 557 U.S. 557, 585-86 (2009); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *see also Gordon v. CIGNA Corp.*, 890 F.3d 463, 470 (4th Cir. 2018).

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018); *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 2014

(4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. But, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

Notably, "[a] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 514 U.S. 1042 (2004); *see also Celotex*, 477 U.S. at 322-24. And, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *Ricci*, 557 U.S. at 585-86; *Matsushita Elec. Indus. Co. Ltd.*, 475 U.S. at 587; *accord Variety Stores, Inc.*, 888 F.3d at 659; *Gordon*, 890 F.3d at 470; *Roland v. United States Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017); *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not

appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).

In sum, to avoid summary judgment, there must be a genuine dispute as to material fact. In *Iraq Middle Mkt. Dev. Found.*, 848 F.3d at 238, the Court reiterated: "A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law."

## V.     The Summary Judgment Motion

### A.     Principles of Contract Construction

In the federal courts, declaratory judgments are authorized by the Declaratory Judgment Act, 28 U.S.C. § 2201(a), which provides, with exceptions not relevant here that, in "a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration . . . ." Because the parties' rights and obligations in this case arise under the Policy, resolution of the Motion turns on the text of the Policy, which must be interpreted in accordance with Maryland law.

Maryland law is well settled that "the interpretation of an insurance policy is governed by the same principles generally applicable to the construction of other contracts." *Mitchell v. AARP*, 140 Md. App. 102, 116, 779 A.2d 1061, 1069 (2001); *see Moscarillo v. Prof'l Risk Mgmt. Servs., Inc.*, 398 Md. 529, 540, 921 A.2d 245, 251 (2007); *State Farm Mut. Ins. Co. v. DeHaan*, 393 Md. 163, 193, 900 A.2d 208, 225-26 (2006); *Cole v. State Farm Mut. Ins. Co.*, 359 Md. 298, 305, 753 A.2d 533, 537 (2000). Accordingly, "'ordinary principles of contract interpretation apply.'"

*Megonnell v. United Servs. Automobile Ass'n*, 368 Md. 633, 655, 796 A.2d 758, 772 (2002) (citation omitted); *see Dutta v. State Farm Ins. Co.,* 363 Md. 540, 556, 769 A.2d 948, 957 (2001).

In "'deciding the issue of coverage under an insurance policy, the primary principle of construction is to apply the terms of the insurance contract itself.'" *Universal Underwriters Ins. Co. v. Lowe*, 135 Md. App. 122, 137, 761 A.2d 997, 1005 (2000) (quoting *Bausch & Lomb, Inc. v. Utica Mut. Ins. Co.*, 330 Md. 758, 779, 625 A.2d 1021 (1993)). However, the court bears responsibility for ascertaining the scope and limitations of an insurance policy. *See Fister v. Allstate Life Ins. Co.*, 366 Md. 201, 210, 783 A.2d 194, 199 (2001); *Mitchell*, 324 Md. at 56, 595 A.2d at 475.

The Maryland Court of Appeals has explained that judicial "interpretation of insurance contracts to determine the scope and limitations of the insurance coverage, like any other contract, begins with the language employed by the parties." *MAMSI Life & Health Ins. Co. v. Callaway*, 375 Md. 261, 279, 825 A.2d 995, 1005 (2003). Generally, Maryland courts "analyze the plain language of [an insurance] contract according to the words and phrases in their ordinary and accepted meanings as defined by what a reasonably prudent lay person would understand them to mean." *Universal Underwriters Ins. Co.*, 135 Md. App. at 137, 761 A.2d at 1005; *see Capital City Real Estate, LLC v. Certain Underwriters at Lloyd's London*, 788 F.3d 375, 379 (4th Cir. 2015) (quoting *Kendall v. Nationwide Ins. Co.*, 348 Md. 157, 166, 702 A.2d 767, 771 (1997)); *Walk v. Hartford Cas. Ins. Co.*, 382 Md. 1, 14-15, 852 A.2d 98, 106 (2004); *Litz v. State Farm Fire and Casualty Co.*, 346 Md. 217, 224, 695 A.2d 566, 569 (1997).

"If the policy's language is clear and unambiguous, the Court will assume the parties meant what they said." *Capital City*, 788 F.3d at 379 (quoting *Perini/Tompkins Joint Venture v. Ace Am. Ins. Co.*, 738 F.3d 95, 101 (4th Cir. 2013)). "'Unless there is an indication that the parties intended

to use words in the policy in a technical sense, they must be accorded their customary, ordinary, and accepted meaning.'" *Maryland Cas. Co. v. Blackstone Intern. Ltd.*, 442 Md. 685, 695, 114 A.3d 676, 681 (2015) (quoting *Mitchell*, 324 Md. at 56, 595 A.2d at 475). However, if there is evidence that the parties intended to ascribe a special or technical meaning to certain words used in an insurance contract, those words are construed in accordance with that understanding. *Valliere v. Allstate Insurance Co.*, 324 Md. 139, 142, 596 A.2d 636, 638 (1991) ("When a policy defines a term in a manner which differs from the ordinary understanding of that term, the policy definition controls."); *see also Walk*, 382 Md. at 14-15, 852 A.2d at 106; *Dutta*, 363 Md. at 556, 769 A.2d at 957.

Moreover, the insurance policy, including endorsements, "must be construed as a whole and 'the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution' must be examined." *United Servs. Auto. Ass'n v. Riley*, 393 Md. 55, 79, 899 A.2d 819, 833 (2006) (quoting *Chantel Assocs. v. Mt. Vernon Fire Ins. Co.*, 338 Md. 131, 142, 656 A.2d 779, 784 (1995)); *Clendenin Bros. v. U.S. Fire Ins. Co.*, 390 Md. 449, 458, 889 A.2d 387, 393 (2006); *see Prince George's Cty. v. Local Gov't Ins. Trust*, 388 Md. 162, 173, 879 A.2d 81, 88 (2005) ("In general, the main insurance policy and an endorsement constitute a single insurance contract, and an effort should be made to construe them harmoniously."); *Pacific Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 388, 488 A.2d 486, 488 (1985); *see also Capital City*, 788 F.3d at 379.

If the court deems the provisions of an insurance policy unambiguous, the meaning of the terms is determined by the court as a matter of law. *Clendenin Bros. Inc.*, 390 Md. at 459, 889 A.2d at 393; *see Pennsylvania National Mutual Casualty Ins. Co. v. Roberts*, 668 F.3d 106, 118 (4th Cir. 2012) (applying Maryland law). In that circumstance, "'a court has no alternative but to

enforce those terms.'" *Megonnell*, 368 Md. at 655, 796 A.2d at 772 (quoting *Dutta*, 363 Md. at 557, 556 A.2d at 1138). But, if a contractual term is ambiguous, the court may consult "extrinsic sources" to ascertain the meaning. *Cole*, 359 Md. at 305, 753 A.2d at 537. A policy term is considered "ambiguous if, to a reasonably prudent person, the term is susceptible to more than one meaning." *Id.* at 306, 753 A.2d at 537.

"'[U]nlike the majority of other states, Maryland does not follow the rule that insurance policies are to be most strongly construed against the insurer.'" *Capital City*, 788 F.3d at 379 (quoting *Empire Fire & Marine Ins. Co. v. Liberty Mut. Ins. Co.*, 117 Md. App. 72, 97, 699 A.2d 482, 494 (1997)); *see Megonnell*, 368 Md. at 655, 796 A.2d at 771; *Bushey v. Nothern Assurance Co. of America*, 362 Md. 626, 632, 766 A.2d 598, 601 (2001); *Collier v. MD-Individual Practice Ass'n*, 327 Md. 1, 5, 607 A.2d 537, 539 (1992). But, "if ambiguity is determined to remain after consideration of extrinsic evidence, 'it will ordinarily be resolved against the party who drafted the contract,' where no material evidentiary factual dispute exists." *Clendenin Bros.*, 390 Md. at 459-60, 889 A.2d at 394; *see Callaway*, 375 Md. at 280, 825 A.2d 995, 1005-06 ("[W]hen a term in an insurance policy is found to be ambiguous, the court will construe that term against the drafter of the contract which is usually the insurer."). In other words, where ambiguous language remains, the court "construe[s] that language 'liberally in favor of the insured and against the insurer *as drafter of the instrument*.'" *Connors v. Gov't Employees Ins. Co.*, 442 Md. 466, 481-83, 113 A.3d 595, 603-05 (2015) (emphasis in original) (quoting *Megonnell*, 368 Md. at 655, 796 A.2d at 772).

### B.    The Pro Rata Method

The parties dispute whether Allstate is liable for all of the damages (the "all sums method") or, instead, only the portion of the damages equal to its share of the time on the risk (the "pro rata method"). In essence, defendants maintain that the all sums method applies. ECF 36. It provides

that an insurer whose coverage is triggered is liable for the full amount of the judgment against the policyholder, up to the amount of its policy limit. Not surprisingly, Allstate supports the pro rata method, which limits an insurer's liability to "that period of time it was on the risk compared to the *entire* period during which damages occurred." *Mayor & City Council of Baltimore v. Utica Mut. Ins. Co.*, 145 Md. App. 256, 313, 802 A.2d 1070, 1104 (2002), *cert. granted*, 371 Md. 613 (2002), *cert. dismissed*, 374 Md. 81 (2003)) (emphasis in original) (citation omitted). That is, an "insurer's liability (up to its policy limit) is measured by the underlying loss multiplied by the ratio of time covered by the policy to the time subject to the risk. The denominator of this fraction [is] the total period of risk . . . [and] the numerator . . . is . . . the portion of [the total period of risk] during which [the insured] had coverage from [the insurer]." *Sybron Transition Corp. v. Security Ins. of Hartford*, 258 F.3d 595, 597 (7th Cir. 2001); *see also Roberts*, 668 F.3d at 113; *Utica*, 145 Md. App. at 312, 802 A.2d at 1103-04.

The Maryland Court of Special Appeals has decided three cases addressing the use of pro rata allocation in continuous injury cases.[4] First, in 2002, the court considered how to allocate liability among several insurance companies for property damage resulting from the installation and presence of asbestos-containing insulation in a building. *Utica*, *supra*, 145 Md. App. at 308-14, 802 A.2d at 1100-04. The court adopted the pro rata method, reasoning that it "conforms with the realities of long term property damage resulting from asbestos in buildings." *Id.* at 309, at 1102. The court said, *id.* at 311, 802 A.2d at 1103:

---

[4] An injury is continuous when it results from repeated exposure to substantially the same general harmful conditions over a period of time. *See Injury*, Black's Law Dictionary (10th ed. 2014) (defining a "continual injury" as an "injury that recurs at repeated intervals."). Black's Law Dictionary also notes that a "continual injury" is "termed (but improperly) continuous injury." *Id.* Notwithstanding Black Law Dictionary's erudition, I shall follow the Maryland courts' practice of referring to "continuous" injuries.

"At the time [the insured] purchased each individual insurance policy, we doubt that [it] could have had a reasonable expectation that each single policy would indemnify [it] for liability related to property damage occurring due to events taking place years before and years after the term of each policy . . . . [T]here is no logic to support the notion that one single insurance policy among 20 or 30 years worth of policies could be expected to be held liable for the entire time period."

(quoting *Public Service Company of Colorado v. Wallis and Companies*, 986 P.2d 924, 940 (Colo. 1999)) (alterations in original).

Moreover, the court "disagree[d] with . . . the 'all sums' and 'joint and several approach' *in general*." *Utica*, 145 Md. App. at 310, 802 A.2d at 1102 (emphasis added). The court's logic turned on the poor fit between the all-sums method and the nature of long-term and continuous injuries. These features are not unique to property damage resulting from asbestos. Rather, they are common across different kinds of injuries, including lead poisoning. Indeed, the court concluded that, "[t]o compress *long-term damage of a continuing nature* into a single policy period, which would effectively be called for under the 'joint and several' or 'all sums' approach, is 'intuitively suspect.'" *Id.* at 311, 802 A.2d at 1103 (emphasis added) (quoting *Olin Corp. v. Insurance Co. of North America*, 221 F.3d 307, 322-23 (2d Cir. 2000)).

In 2005, in *Riley v. United Servs. Auto. Ass'n*, 161 Md. App. 573, 587-94, 871 A.2d 599, 608-12 (2005), *aff'd*, 393 Md. 55, 899 A.2d 819 (2006), the Court of Special Appeals affirmed the logic of *Utica*. There, the court considered an insurer's liability under a policy for lead-induced injuries spanning multiple policy periods. "Maryland law," the court concluded, "dictates that the judgment be allocated pro rata among the policies based on their time on the risk." *Id.* at 592, 871 A.2d at 611. The court reasoned that the all-sums method "runs counter to the pro rata by time-on-the-risk allocation method adopted in continuous injury cases in Maryland." *Id.*[5]

_____

[5] The Maryland Court of Appeals did not reach the issue of the proper method for allocating damages.

The Court of Special Appeals reached the same conclusion the following year in another lead paint case. *See Md. Cas. Co. v. Hanson*, 169 Md. App. 484, 902 A.2d 152 (2006). Noting that in *Utica* it had "specifically rejected the all-sums approach," *id.* at 519, 902 A.2d at 167 (citing *Utica*, 145 Md. App. at 311, 802 A.2d at 1103), the court again concluded that the pro rata method, not the all sums method, applies when allocating liability among insurers in lead poisoning cases. *Hanson*, 169 Md. App. at 519, 902 A.2d at 167.

Notably, the Fourth Circuit has also concluded that Maryland law requires application of the pro rata method in lead poisoning cases. In *Roberts*, 668 F.3d 106, the Court stated: "In lead paint or continuous trigger cases such as this one, Maryland courts engage in a 'pro rata by time-on-the-risk allocation' of liability." *Id.* at 113 (citing *Hanson*, 169 Md. App. at 512, 902 A.2d at 168); *see also In re Wallace & Gale Co.*, 385 F.3d 820, 835 (4th Cir. 2004) (holding that after *Utica*, "the pro-rata allocation method is correct under Maryland law"); *Riley*, 161 Md. App. at, 592, 871 A.2d at 611. "Applying Maryland law," the Court therefore affirmed the lower court's use of the pro rata method. *Roberts*, 668 F.3d at 111; *see also Blue*, 2019 WL 266281, at *4 (applying the pro rata method in a similar lead exposure case).

Defendants maintain that the pro rata method does not apply here because the Policy is different from the kind of insurance policy at issue in *Roberts*, 668 F.3d 106. ECF 36 at 3-10. According to defendants, *Roberts* "is neither analogous or applicable to the facts of this case," because the policy in *Roberts* limited coverage to injuries suffered during the policy period. *Id.* at 1. But, they argue that the Policy here covers bodily injuries (*e.g.*, lead poisoning) suffered at any time provided that there is a covered "occurrence" (*i.e.*, exposure to lead at any time during the policy period). *Id.* at 1-2.

The Fourth Circuit explained the insurance policy at issue in *Roberts*, 668 F.3d at 110 (emphasis added):

> Under the contract, Penn National promised to "pay those sums that [the insured] becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies" as well as "defend any 'suit' seeking those damages." This guarantee was in turn qualified by a provision stating that "this insurance applies to 'bodily injury' and 'property damage' only if . . . the 'bodily injury' or 'property damage' occurs *during the policy period*."

In this case, the Policy states: "Allstate will pay when an insured becomes legally obligated to pay for personal injury or property damage caused by an occurrence." ECF 1-3 at 12 (emphases omitted). The Policy also provides that it "applies to an **occurrence** anywhere in the world **while the insurance is in force**." ECF 1-3 at 10 (second emphasis added).

In *Allstate Ins. Co. v. Blue*, ADC-18-1199, 2019 WL 266281, at *3 (D. Md. Jan. 18, 2019), the court considered this same language. The court concluded that it was functionally equivalent to the language in *Roberts*. *Id.* ("Whether it is phrased as 'during the policy period' or 'while the insurance is in force,'" the resulting plain meaning is the same.").

Moreover, even if Allstate is liable for all injuries caused by an occurrence, the Court still must determine which injuries resulted from lead exposure during the policy period. This is the same issue that Maryland courts faced in *Hanson*, *Utica*, *Riley*, and *Roberts*. Defendants' preferred approach, "compress[ing] *long-term damage of a continuing nature* into a single policy period, . . . is 'intuitively suspect.'" *Utica*, 145 Md. App. at 311, 802 A.2d at 1103 (emphasis added) (quoting *Olin Corp. v. Insurance Co. of North America*, 221 F.3d 307, 322-23 (2d Cir. 2000)). Instead, under Maryland law, "[i]n lead paint or continuous trigger cases such as this one, Maryland courts engage in a 'pro rata by time-on-the-risk allocation' of liability." *Roberts*, 668 F.3d at 113; *see also In re Wallace & Gale Co.*, 385 F.3d at 835 (holding that after *Utica*, "the pro-rata allocation method is correct under Maryland law")).

Defendants also argue that because the Policy is a personal umbrella policy it "provided more expansive coverage to Mr. Rochkind than a typical primary insurance policy might." ECF 36 at 9. However, as Allstate correctly maintains, a personal umbrella policy is still a contract and must be interpreted as such. ECF 37 at 7. Because the Policy covers only an occurrence "while the insurance is in force," the pro rata method still applies in this case. ECF 1-3 at 10 (emphasis omitted).

### C.      Length of Exposure

To apply the pro rata method, the Court must determine the length of time that each Tort Plaintiff was exposed to lead, *i.e.*, the exposure period. Therefore, the Court must determine the start date and end date for each of the Tort Plaintiffs. Allstate contends that the start date for Mr. Roberts is September 1, 1995, when, according to Allstate, he first resided at North Spring Street. ECF 31-1 at 10. Allstate asserts that the start date for Ms. Roberts is her date of birth, October 5, 1997. *Id.* at 10-11. Allstate contends that the end date for both of the Tort Plaintiffs is December 31, 2002, when, according to Allstate, they vacated the property at North Spring Street. *Id.* at 9-11. Defendants do not directly address this issue. *See* ECF 36.

The Court has identified only three federal cases, based on Maryland law, addressing the calculation of the end date. *See* SEAMAN & SCHULZE § 10:2 (explaining that nationwide, there is a "relative dearth of legal decisions on proper start and stop dates for allocation purposes, as opposed to trigger rulings"). In these cases, to determine the end date, the courts looked to the record from the underlying state court trials on the tort dispute. Their decisions were fact bound and did not turn on public policy considerations or the language of the insurance policy or state law.

In the first case, an insurer sought declaratory judgment limiting its responsibility for damages to a tort plaintiff to its pro rata share. *Pennsylvania Nat. Mut. Cas. Ins. Co. v. Attsgood Realty*, JFM-09-2650, 2010 WL 2998681 (D. Md. July 27, 2010), *aff'd in part, rev'd in part sub nom. Pennsylvania Nat. Mut. Cas. Ins. Co. v. Roberts*, 668 F.3d 106 (4th Cir. 2012). The district court set the start date of the exposure period at the tort plaintiff's date of birth, not the date of her first elevated blood lead level. *Id.* at *1. It reasoned that the "evidence in the underlying litigation, including the testimony of [the tort plaintiff's] expert, . . . established that [the tort plaintiff] was first exposed to lead paint when she was born." *Id.* at *1.

By contrast, the court set the end date of the exposure period to the date of the tort plaintiff's final elevated blood lead level, not the date when the tort plaintiff moved from the Property. The court said that the tort plaintiff "continued to reside at the subject premises until sometime in 1998 but I find that the August 1995 test should be the cut-off date for application of the continuous trigger rule because by that time the harm had been done." *Id.* at *1 n. 2.

On appeal, the Fourth Circuit found substantial evidence in the record that the tort plaintiff had been exposed to lead paint since her birth. *Roberts*, 668 F.3d at 117. Therefore, it concluded that the proper start date was the defendant's date of birth, because it marked the start of her exposure to lead paint. *Id.*[6] The end date was not at issue in the appeal. *Id.* at 111

In *Pennsylvania Nat'l Mut. Cas. Ins. Co. v. Jacob Dackman & Sons, LLC*, RDB-16-cv-2640, 2017 WL 4098749 (D. Md. Sept. 14, 2017), another judge in this District considered the proper end date of the tort plaintiff's exposure to lead paint. After reviewing the Fourth Circuit's

---

[6] The *Roberts* Court observed that the length of exposure (55 months) is the denominator, while the period of coverage (24 months) is the numerator. And, it observed: "[T]he denominator drives the amount of Penn National's liability. Roberts [the tort plaintiff] seeks to shrink it as much as possible in order to maximize her recovery" from the insurance company. *Id.* at 116.

opinion in *Roberts*, the court concluded that it was "not bound" by *Roberts* to use the tort plaintiff's final elevated blood lead level "as the end date of the entire period during which damages occurred." *Id.* at *3. Rather, the court concluded it "must base this determination on the evidence presented at trial in the Underlying Litigation." *Id.*

The court stated that after the tort plaintiff permanently vacated the premises, he continued to have elevated blood lead levels. *Jacob Dackman*, 2017 WL 4098749, at *4. But, the court concluded that the tort plaintiff was not exposed to "an external source of lead poisoning." *Id.* As a result, the court set as the end date the date that the tort plaintiff permanently vacated the premises, because that was "the latest date of lead exposure." *Id.*

More recently, in *Allstate Ins. Co. v. Rochkind*, ELH-17-3400, 2019 WL 1440647, at *25 (D. Md. Mar., 31, 2019), I considered the proper end date of the tort plaintiff's exposure to lead paint. But, I was unable to reach a conclusion, as the record was limited to two relevant exhibits.

Allstate contends that the relevant end date is the date that the Tort Plaintiffs vacated the premises. *See* ECF 31-1 at 9-11. In discovery, the Tort Plaintiffs stated that they moved from 1635 N. Spring Street in 2002, but did not provide a specific date. ECF 31-3 at 2; ECF 31-4. Nevertheless, Allstate asserts, without explanation or citation, that the defendants vacated the premises on December 31, 2002. *Id.* at 10. Based on the limited record, this date may be incorrect, as the Tort Plaintiffs also claimed to reside at 919 North Collington Street beginning in 2002. ECF 31-3 at 2; ECF 31-4 at 2. And, the date materially affects Allstate's liability for any judgment. If the Tort Plaintiffs vacated the N. Spring Street property on January 1, 2002 instead of December 31, 2002, Allstate would be liable for 59.68% instead of 51.57% of any damages owed to Mr. Roberts. Similarly, it would be liable for 39.77% instead of 32.20% of any damages owed to Ms. Roberts.

In *Rochkind*, 2019 WL 1440647, at *24, Allstate contended that, "pursuant to the Fourth Circuit's holding in *Roberts, supra,* 668 F.3d 106, the end of the exposure period under the pro rata method is the date of the final test showing an elevated blood lead level." Yet, plaintiff does not explain the discrepancy between its positions. Nor do the defendants address the proper end date.

As noted, a court must determine the appropriate end date based on the evidence in the case before it. *Jacob Dackman*, 2017 WL 4098749, at *3. In *Roberts* and *Jacob Dackman*, the courts reviewed the records from the underlying state court *trials.* Here, the judicial record is thin, even though the parties appear to be preparing for trial in State court. *See Wyman Park*, Case No. 24-C-16-949.[7] The parties have submitted only two sets of answers to interrogatories (ECF 31-3; ECF 31-4) and three academic articles. ECF 36-2 to ECF 36-4. This lack of evidence as to Mr. Roberts is especially problematic. The record includes only the results of his blood test dated September 7, 1996, even though other blood tests appear to have been performed. ECF 33-3 at 5.

Accordingly, I cannot reach any conclusion as to the length of the exposure period.

## VI.     The Motion to Stay

Defendants urge the Court to stay this case. ECF 43. They maintain that the Maryland Court of Special Appeals will consider the application of the pro rata method in *Robinson v. CX Re*, No. 01888, Sept. Term 2016 (Md. Ct. Spec. App.). Although *Robinson* was argued on

---

[7] A "court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb*, 791 F.3d at 508; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, 565 U.S. 825 (2011); *Philips v. Pitt Cty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). However, under Fed. R. Evid. 201, a court may take judicial notice of adjudicative facts only if they are "not subject to reasonable dispute," in that they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

November 9, 2017, it apparently has not yet been decided. Therefore, defendants urge the Court to delay ruling on the Summary Judgment Motion until the Court of Special Appeals decides *Robinson*.

As indicated, the Court of Special Appeals and the Fourth Circuit have made clear that the pro rata method governs damage allocations in continuous injury disputes in Maryland. *See Roberts*, 668 F.3d 106; *Hanson*, 169 Md. App. 484, 902 A.2d 152; *Riley, supra,* 161 Md. App. 573, 871 A.2d 599; *Utica*, *supra*, 145 Md. App. 256, 802 A.2d 1070. Even if the Court were persuaded by defendants' arguments, it is nevertheless bound by the Fourth Circuit's decision in *Roberts*. I see no reason to delay ruling until the Maryland Court of Special Appeals decides *Robinson v. CX Re*.

## VII.    The Motion to Strike

Defendants attempt to characterize Allstate's supplement (ECF 39) as a surreply and move to strike it. ECF 41. They assert that Allstate should have sought leave of court, pursuant to Local Rule 105.2(a), which provides that "[u]nless otherwise ordered by the Court, surreply memoranda are not permitted to be filed." *Id.*

Allstate claims it "has an ethical duty to apprise this Court of a new ruling that was made after this matter was fully briefed and is directly on point with the law and arguments present in this matter." ECF 42 at 2.

The filing of a surreply "is within the Court's discretion, see Local Rule 105.2(a), but they are generally disfavored." *EEOC v. Freeman*, 961 F.Supp.2d 783, 801 (D. Md. 2013), *aff'd in part*, 778 F.3d 463 (4th Cir. 2015); *see also Chubb & Son v. C & C Complete Servs., LLC*, 919 F. Supp. 2d 666, 679 (D. Md. 2013). A surreply may be permitted when the party seeking to file the surreply "would be unable to contest matters presented to the court for the first time" in the opposing party's

reply. *Clear Channel Outdoor, Inc. v. Mayor & City Council of Baltimore*, 22 F. Supp. 3d 519, 529 (D. Md. 2014) (quotations and citations omitted). However, a surreply is not generally permitted where the reply is merely responsive to an issue raised in the opposition. *See Khoury v. Meserve*, 268 F.Supp.2d 600, 605-06 (D. Md. 2003).

Allstate's supplement simply alerted the Court to *Blue*, 2019 WL 266281. Additionally, when Allstate filed its reply on January 10, 2019, it was unable to address *Blue*, which had not yet been decided. *See* Docket. As a result, I shall assume, *arguendo*, that Allstate filed a surreply, and I shall grant it leave to do so. The defendants' Motion to Strike is denied.

### VIII.   Conclusion

For the foregoing reasons, I shall deny Allstate's Summary Judgment Motion, the defendants' Motion to Stay, and the defendants' Motion to Strike. The parties shall be directed to submit a proposed scheduling order, jointly if possible, concerning the remaining issues.

An Order follows.

Date:  May 7, 2019

_____/s/_____
Ellen Lipton Hollander
United States District Judge